**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION**

**ROBERT O. BILLINGSLEY,**

       **Plaintiff,**

**v.**                                 **Civil Action No.: 5:13-cv-126**
                                          **JUDGE STAMP**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

       **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE
RECOMMENDING THAT THE DISTRICT COURT DENY PLAINTIFF'S
MOTION FOR JUDGMENT ON THE PLEADINGS [13], GRANT
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [19],
AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.   INTRODUCTION

On September 10, 2013, Plaintiff, Robert O. Billingsley ("Plaintiff"), by counsel Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). ( ECF No. 1). On November 19, 2013, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the administrative record of the proceedings. (Answer, ECF No. 9; Administrative Record; ECF No. 10). On December 18, 2013, Plaintiff filed her Brief in Support of Judgment on the Pleadings. (Pl.'s Br. in Supp. of J. on Pleadings ("Pl.'s Br."), ECF No. 14.) On March 3, 2014, the Commissioner filed her Motion for Summary Judgment. (Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 20). Following review of the Motions by the parties and the record, the undersigned Magistrate Judge now issues this Report and Recommendation.

## II.    BACKGROUND

### A.    *Procedural History*

On September 27, 2011 and November 3, 2011, respectively,[1] Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI"), alleging disability that began September 19, 2008. (R. at 158-61, 161-70). Both claims were initially denied on July 5, 2012 and again upon reconsideration on October 1, 2012 (R. at 70-73). On October 12, 2012, Plaintiff filed a request for a hearing, which was held before United States Administrative Law Judge ("ALJ") Terrence Hugar on February 21, 2013 in Wheeling, West Virginia. (R. at 115-116, 30-69). Plaintiff, represented by Yvonne Costelloe, Esq., appeared and testified, as did Larry Ostrowski, a vocational expert. (*Id*.) On March 5, 2013, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act ("Act"). (R. at 11-24) On July 17, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-5). Plaintiff now requests judicial review of the ALJ's decision finding him not disabled.

### B.    *Personal History*

Plaintiff was born on March 21, 1950 and was 62 years old at the time of this hearing. (R. at 48). He has a high school diploma and four or more years of a college education. (R. at 203). He worked as an editor for a newspaper from 1972 to April 1998 and as a telemarketer from July 1998 to September 2008. (R. at 203). He is not married and has no children. He owns his home

---

[1] The ALJ's decision lists a date of March 1, 2012 for when Plaintiff filed his application for DIB and a date of September 23, 2011 for when Plaintiff filed his application for SSI. (R. at 11). However, his applications, contained as Exhibits 1D and 2D in the Administrative Record, both refer to a date of September 27, 2011 for the DIB and a date of November 3, 2011 for the SSI. (R. at 158, 162.) There is no mention of September 23, 2011 in either application. Furthermore, the only mention of September 23, 2011 is in Plaintiff's application for SSI and refers to Plaintiff's "fugitive felon/parole or probation violator" status as of that date. (R. at 163).

but lives with his mother at her home because it is one story. (R. at 45). He cares for is mother because she has total dementia. (*Id.*).

## C.    *Medical History*

### 1.    Medical History Pre-Dating September 19, 2008

Plaintiff has a history of kidney cancer, which resulted in a left nephrectomy in 2002. Dr. Bragg has Plaintiff's primary care physician. (R. at 312-54). On August 27, 2007, Plaintiff reported to Dr. Bragg for leg swelling. (R. at 312). On February 25, 2008, Dr. Bragg noted that Plaintiff needed a colonoscopy. (R. at 313).

On April 28, 2008, Plaintiff had imaging taken by WVU Healthcare. (R. at 253). Imaging of the kidney showed renal echogenicity is within normal limits. *(Id.).* Imaging results of chest and lateral showed no evidence of acute or active cardiopulmonary disease. *(Id.)* On May 2, 2008 lab results showed PSA at 3.9. (R. at 337). On August 7, 2008, Dr. Bragg advised Plaintiff to schedule a colonoscopy and follow up with her in three months. (R. at 314).

On August 15, 2008, Plaintiff reported to Dr. Adeniyi of Associate Specialist's Inc. for evaluation of varicose veins and swelling of both lower extremities. (R. at 554-56). The doctor's notes reflect that these symptoms have been life long but have been progressively getting worse. *(Id.).* The plan of treatment was graduated support stockings and possible varicose vein surgery. *(Id.)* On August 20, 2008, Plaintiff was seen by Dr. Adeniyi to discuss Plaintiff's test results. (R. at 553). Dr. Adeniyi recommended that Plaintiff undergo varicose vein surgery, to which Plaintiff consented. *(Id.).*

On September 16, 2008, Plaintiff had a colonoscopy at United Hospital Center by Dr. Fischer. (R. at 300). A polyp was removed by cold-biopsy forceps and hemorrhoids were confirmed

*(Id.)*.  Plaintiff was diagnosed with focal acute colitis.  (R. at 300, 302).  Dr. Fischer recommended a high-fiber diet and repeat colonoscopy in three to five years, pending the results of the histology. (R. at 301).

### 2. Medical History Post-Dating September 19, 2008

On October 10, 2008, Plaintiff was seen as follow up after varicose vein surgery.  (R. at 553). Dr. Adeniyi reported that the incisions looked great and Plaintiff was able to return to full unrestricted activity.  *(Id.)*.

On May 11, 2009 Plaintiff had imaging taken by WVU Healthcare (R. at 253).  The results by Dr. Williams indicated that there was no evidence of hydronephrosis.  *(Id.)*.  The renal echogenicity is within normal limits.  *(Id.)*.  The bladder is only slightly distended.  (R. at 254). Imaging of the chest and lateral taken on May 11, 2009 showed a new nodular density in the right upper lung. *(Id.)* Further evaluation was recommended *(Id.)*  Dr. Saunders and Dr. Zaslau wrote in a progress note on May 11, 2009, that Plaintiff is a 59 year old male who has a history of left nephrectomy for renal cell carcinoma in 2002.  (R. at 255).  He also had a history of elevated PSA and was scheduled for a prostrate biopsy but his levels decreased in October so he wasn't checked. *(Id.)*.  His visit on May 11, 2009 was for a follow up on his renal cell carcinoma.  Dr. Saunders and Dr Zastau reported that while Plaintiff's physical exam showed no acute distress, Plaintiff has a history of elevated PSA, new microscopic hematuria and a history of kidney cancer.  *(Id.)*. Therefore, the doctors determined that he should have a recheck of his PSA, that he should follow up in three months for a recheck on his urinalysis to look for microscopic hematuria and for his history of kidney cancer, he should follow up in one year. *(Id.)*.

On June 23, 2009, Plaintiff reported to Dr. Bragg, his primary physician, who noted "no

physical problem wants to fight for disability." (R. at 315). Dr. Bragg ordered a CT scan which was taken on June 26, 2009. *(Id.)*. Dr. Bragg also ordered views of both the right and left knee as Plaintiff was complaining of knee pain. (R. at 333). Dr. LaPlante read the results of knee imaging stating that four views of the left knee demonstrate no fracture. There is good alignment. The joint space is maintained and no joint effusion is seen. *(Id.)*. His impression was "Unremarkable study." *(Id.)*. Similarly, upon five views of the right knee his impression was unremarkable. (R. at 334).

On June 26, 2009 a CT scan was taken of Plaintiff's abdomen and was read by Dr. Hirsch of United Hospital Care. (R. at 311, 331). His impressions were that the bowel loops herniate into the left posterior flank and are non-obstructed. *(Id.)*. Dr. Hirsch suspected this hernia is the site of a prior surgery for left nephrectomy. *(Id.)*. Dr. Hirsch also reported that there was no periaortic adenopathy and no abnormality in left renal bed detected. *(Id.)*. He does report gall bladder stones, small hiatus hernia and mild lumbar scoliosis convex left. *(Id.)*.

On August 10, 2009, Plaintiff saw Ms. Hess, PA-C and Dr. Zaslau for follow up care. Plaintiff's urine was positive for blood at this time and he decided to undergo cystoscopy. (R. at 256). The doctors assessment was microscopic hematuria, history of bilateral RCC status post left nephrectomy and right partial nephrectomy and BPH. *(Id.)*

On October 5, 2009, the imaging results of Plaintiff's kidney showed status post left nephrectomy, right kidney unremarkable and prostatic hypertrophy.

On September 2, 2010, Plaintiff had a follow up with Dr. Bragg. (R. at 316).

On September 3, 2010, Dr. John Brick from WVU Health care wrote a medical report stating that Plaintiff had a neuromuscular disease known as central core myopathy. (R. 252). It can cause progressive skeletal muscle weakness and problems with the cardiac muscle. (Id). Dr. Brick opined

that Plaintiff's current condition is so severe that it prevents him from being gainfully employed. (Id). Dr. Brick's return outpatient note indicated that as of September 3, 2010, Plaintiff was having more trouble with his gait. (R. at 259). He can no longer get up off the ground without a great degree of difficulty and he is also having swelling in his leg. *(Id.)*. Dr. Brick's examination revealed a healthy appearing patient, except he had moderate weakness in his arms and legs as well as his facial musculature. Dr. Brick's diagnosis is renal cell cancer and central core myopathy. *(Id.)*. Dr. Brick's concern is that the leg swelling could be cardiac related and asked Plaintiff to return in six months. *(Id.)*. On September 10, 2010, Dr Brick received the results of an echocardiogram that he ordered. (R. at 595). The results of that test showed normal aorta measurements and normal doppler measurements. (R. at 597).

On September 14, 2010, Plaintiff had an echocardiogram, kidney imaging, chest and lateral imaging. (R. at 262). On September 20, 2010, Dr. Zaslau wrote in an outpatient progress note that on physical examination, Plaintiff had no acute distress. (R. at 263, 600). Plaintiff had history of elevated PSA but wanted to wait on prostrate biopsy. Plaintiff was to follow up in one year. *(Id.)*.

A chest x-ray dated September 20, 2010, indicated that when compared to prior examination the heart and upper limits were normal in appearance and there was no radiographic evidence for pulmonary metastatic disease. (R. at 599, 601). A kidney imaging taken on September 20, 2010 showed stable postoperative changes status post left nephrectomy, unremarkable right kidney and redemonstration of prostatic hypertrophy. (R. at 602).

On October 4, 2010, January 31, 2011, February 23, 2011, and May 2, 2011 , Plaintiff had follow ups with Dr. Bragg. (R. at 317-320)

On July 7, 2011, Plaintiff had follow up with Dr. Bragg (R. at 321). Dr. Bragg ordered

peripheral venous imaging, right lower extremity because of swelling and pain in Plaintiff's right lower extremity so that he could rule out deep venous thrombosis. (R. 340). The test revealed no evidence of deep venous thrombosis (DVT). *(Id.)* However Dr. Mossallati noted evidence of superficial phlebitis right greater saphenous vein. *(Id.).*

On July 30, 2011, Plaintiff reported to Physicians First Care in Nutter Fort, West Virginia for Edema in his feet and renal bleeding and pain. (R. at 266). Plaintiff was told to follow up in three days if no improvement and was referred to Dr. Fischer. (R. at 266-67).

On August 9, 2011, Plaintiff reported to Dr. Fischer of Clarksburg Surgical Specialists, Inc. for rectal bleeding. (R. at 290). On August 14, 2011, Plaintiff was prescribed Hydrocortisone and Augmentin and was to schedule a colonoscopy. (R. at 269). A colonoscopy was completed on August 24, 2011. The colonoscopy showed in mid rectum a large polypoid lesion that was the cause of the bleeding. (R. at 298). Multiple biopsies of polypoid were obtained and a CT scan was ordered. *(Id.).* The CT scan read by Dr. Miagiolo showed a large rectal mass and a large hiatal hernia and the prostrate was enlarged. (R. at 309-10).

Plaintiff followed up with a visit to Dr. Fischer's office on September 1, 2011. Dr. Fischer discussed that the biopsies were positive for malignancy and the CT scan showed prior left nephrectomy, cholelithiasis, large hiatal hernia, normal bladder. (R. at 293).

On September 8, 2011, Dr. Stewart writes a thank you to Dr. Fischer for referring the Plaintiff to him and gives a history of the patient. (R. at 282). In that history, Dr. Stewart refers to Plaintiff as "a retired newspaper worker." *(Id.).*

On September 16, 2011, Dr. Fischer inserted a powerport on Plaintiff's left side for his preoperative chemo/radiation. (R. at 277). The surgery went well and patient was sent to recovery

in good condition.  (R. at 278).

On October 27, 2011, Dr. Stewart of the Radiation Oncology Department at United Hospital Center wrote a summary of Plaintiffs therapy and discharged him from his care.  (R. at 273, 282). Dr. Stewart reported that Plaintiff had completed preoperative chemotherapy and radiation for stage II rectal cancer.  *(Id.)*.  Dr. Stewart further noted that he tolerated the therapy without incident.  His rectal bleeding ceased and required no interruption in therapy.  Plaintiff's treatment period was from September 19 through October 26, 2011. *(Id.)*.

On November 28, 2011 Plaintiff had chest x-rays which showed hiatal hernia and no acute findings of the lungs. (R. at 405).  On November 30, 2011, Plaintiff had follow up with Dr. Bragg. (R. at 322).  On December 1, 2011, Dr. Bragg ordered Peripheral venous imaging , right lower extremity of Plaintiff.  (R. at 323, 562).  Dr. Mossallati wrote that the image revealed satisfactory appearing femoral and popliteal veins in the right leg with no evidence of deep venous thrombosis. (R. at 323, 562).

On December 8, 2011, the consultive report of Ravi K. Singh, PA-C indicated  at that time Plaintiff "[d]enies any hesitancy, frequency.  Denies any frequency, gross hematuria, urgency, or dysuria."  (R. at 372).   Plaintiff will be taken to operating room by Dr. Franklin for the placement of a right stent on the procedure.  *(Id.)*.

On December 9, 2011, Dr. Franklin placed a right ureteral stent in Plaintiff and then left Plaintiff in care of general surgery team.  (R. at 377).  Dr. Fischer then performed an ultra low anterior resection with primary anastomosis for the malignant neoplasm mid rectum. (R. at 333-34). The surgery was successful and the patient was returned to recovery in satisfactory condition.  (R. at 344).

On December 9, 2011, Dr. Coonley was consulted regarding Plaintiff's medical oncology. (R. at 346). Dr. Coonley noted in history of Plaintiff's present illness that Plaintiff "presented this year with [one] month of rectal bleeding." (R. at 346). Plaintiff completed radiotherapy in October and recently underwent low anterior resection surgery. *(Id.)*. Dr. Coonley reported that since Plaintiff's treatment, Plaintiff "... has noticed cessation of rectal bleeding and normalization of bowel movements. He has no diarrhea, constipation, or pelvic pain. He has been feeling reasonably well." *(Id.)*. For Past History, Dr. Coonley indicated that Plaintiff's childhood is unremarkable except that he may have been born with myopathy. (R. at 346). His adult medical history consists of hyperlipidemia, history of kidney tumor, cholelithiasis, hiatal hernia, myopathy and hypertension. (R. at 347). Plaintiff's prior surgical history includes: left nephrectomy, hernia repair, port -a-cath insertion, colonoscopy. *(Id.)*. Dr. Coonley's review of Plaintiff's system were all normal except slight leg swelling. *(Id.)*. Plaintiff's symptoms resolved during preoperative chemo radiotherapy. *(Id.)*.

Dr. Bragg writes on December 9, 2011, that Plaintiff was seen earlier this week in his office for swelling in his legs. (R. at 369). Dr. Bragg reports that a venous Doppler was done and there was no evidence of deep vein thrombosis. *(Id.)*. Dr. Bragg further noted that "[h]e is on his legs a lot at home, taking care of an invalid mother who is currently under hospice care, and that helps to induce most of his swelling. He has not been wearing his TED hose as he is suppose to wear." *(Id.)*. Dr. Bragg's plans to follow patient after surgery as consultant. (R. 370). On December 10, 2011, Dr. Bragg ordered a chest x-ray which showed normal heart size and no definite acute cardiopulmonary process. (R. at 561).

Dr. Fischer discharged Plaintiff on December 22, 2011, on knee high TEDS and other

medications with follow up to be arranged with Dr. Bragg, Dr. Fischer and Dr. Coonley. (R. at 363).

On January 2, 2012, Plaintiff had a follow up office visit with Dr. Fischer. (R. at 412). After 24 days post op, Dr. Fischer report's Plaintiff's bowels are better. (Id). Plaintiff's problem is voiding so Flomax daily is added to his regimen. *(Id.).* The doctor reports that he is showering okay; his appetite is okay; that he is walking with a cane instead of a walker and that he has no blood in his urine. *(Id.).*

On January 9, 2012, Plaintiff reported for post op chemotherapy with Dr. Coonley of Oncology Hematology Associates. (R. at 428). Dr. Coonley reported the history of Plaintiffs present illness and performed a physical examination. *(Id.).* Dr. Coonley reported a normal physical examination noting that there was diffuse weakness in the lower extremities but no edema. (R. at 429). On January 16, 2012, Plaintiff follows up again with Dr. Coonley. (R. at 430). Dr. Coonley notes that Plaintiff ambulates with a cane due to congenital myopathy and that he recovered well from surgery. *(Id.).* No changes were noted. *(Id.).*

On January 18, 2012, Dr. Omar wrote a letter to Health Access stating that Plaintiff is in medical need of a walking device such as a cane. (R. at 604).

On January 31, 2012, Plaintiff returned for a four week follow up with Dr. Fischer. (R. at 415). Dr. Fischer reported that Plaintiff's Prostrate issues are much better. *(Id.).* Plaintiff still has occasional hesitancy. (Id). Flomax is helping. *(Id.).* Abdomen and incision are good. *(Id.).* Dr. Fischer indicates that at some point urology needs to see him because he has only the one kidney and with prostate issues he could end up with a problem. *(Id.).* Plaintiff should follow up in three months. *(Id.).*

On February 13, 2012, Plaintiff had post op chemotherapy appointment with Dr. Coonley

who noted that Plaintiff was tolerating therapy well except for frequent soft stools then constipation after taking immodium.  (R. at 433).  Plaintiff was to follow up in two weeks or as needed.  (R. at 434).

On February 27, 2012, Plaintiff had post op chemotherapy appointment with Dr. Coonley who noted that Plaintiff was tolerating therapy well and no changes.. (R. at 435)

On March 12, 2012, Plaintiff reported again for chemotherapy  with Dr. Coonley who noted that Plaintiff was tolerating therapy well with a 10 percent dose attenuation of camptozar. (R. at 436).   Dr. Coonley noted, "Reduced camptozar and recommend immodium in view of stool frequency.  No other problems with treatment." (R. at 438).

On March 26, 2012, Plaintiff reported for chemotherapy with Dr. Coonley, who noted no new complaints.  (R. at 440).  On April 9, 2012, Plaintiff reported for post-op chemotherapy with Dr. Coonley, who noted no new complaints other than chronically weak legs.  (R. 442).

On April 10, 2012, Plaintiff had a CT of the abdomen and pelvis  to reevaluate his left renal cell carcinomas.  (R. at 418).    Impressions were that "postop changes left renal bed.  Left lateral hernia at the operative site.  Gallbladder Stones....  Since August 24, 2011, a rectal mass have been resected." (Id).

On April 23, 2012, Plaintiff reported for his final post op chemotherapy treatment with Dr. Coonley.  (R. at 445). Dr. Coonley noted no new complaints and suggested follow up in three months or as needed.  (R. at 447).  A chest x ray on April 23, 2012, showed chronic changes with hiatal hernia and no acute findings.  (R. at 468).  Peripheral Venous imaging take on April 23, 2012 showed low probability DVT right leg and evidence of superficial phlebitis.  (R. at 468).

On May 1, 2012, Plaintiff reported for his three month follow up with Dr. Fischer.  (R. at

472, 473). Dr. Fischer reports that stools are problematic, but Plaintiff admits he is not eating enough fiber and does not watch his diet as much as he should. (R. at 473). Plaintiff reports seeing a urologist and his PSA was 1.6. *(Id.).* Dr. Fischer also noted a superficial blood clot in leg that is being treated with aspirin. *(Id.).* Since no further chemotherapy treatments are needed, Plaintiff will schedule removal of the port. *(Id.).*

On May 2, 2012, Plaintiff reported to United Hospital Center for an MRI on his cervical spine. (R. at 448). Dr. Thrush's impressions were "Signal abnormality of C6 uncertain etiology. Hopefully degenerative in nature. Follow up would be needed to definitely exclude early metastatic disease. Otherwise mild degenerative changes C5-C6 and C6-C7. No significant disk herniation, stenosis or other abnormality." (R. at 449).

On May 4, 2012, a peripheral venous imaging was performed on Plaintiff showing no evidence of DVT. (R. at 569).

On May 9, 2012, Dr. Fischer's records indicated that Plaintiff was being treated by Dr. Coonley for a blood clot and that Dr. Coonley would prefer that Dr. Fischer schedule the port removal for mid June. (R. at 473).

On May 21, 2012, Dr. Fischer's records noted that Genie from Catastrophic called and Plaintiff will be covered until the end of June 2012. (R. at 473).

On June 4, 2012, Plaintiff had follow up with Dr. Coonley who reported no new complaints. (R. at 451). Dr. Coonley wrote that Plaintiff will need colonoscopy later this year and ordered a venous doppler at Plaintiff's request. (R. at 453). The venous doppler was taken on June 4, 2012 and revealed "satisfactory appearing femoral and politieal veins in the right leg with no evidence of deep venous thrombosis. (R. at 466).

On June 12, 2012, Dr. Fischer's records indicated that the Dr. Coonley's office had called stating the blood clot had resolved.  (R. at 473).

On June 18, 2012, Dr. Fischer removed the Port-A-Cath because chemotherapy was concluded.  (R. 454, 474).  Dr. Fischer noted that Plaintiff tolerated procedure well.  *(Id.)*.

On June 26, 2012, Plaintiff followed up with Dr. Fischer after the port removal.  (R. at 474). Dr. Fischer noted that the Plaintiff was doing well and that his wound site had healed nicely.  *(Id.)*. Dr. Fischer also noted that Plaintiff would need colonoscopy at one, three and five years from rectal surgery.  (Id).

On July 5, 2012, a Physical Residual Functional Capacity Assessment was performed by Dr. Fulvio Franyutti.  (R. at 475-482).  Dr. Franyutti determined that Plaintiff could occasionally lift 20 pounds and  frequently lift 10 pounds. (R. at 476).   Plaintiff could stand and/or walk with normal breaks for a total of six hours in a eight hour work day.  (Id).   Plaintiff has no manipulative, visual or communicative limitations.  (R. at 478, 479).  Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, vibration and hazards such at machinery and heights.  (R. at 479).  Dr. Franyutti noted that the Patient was credible and should be reduced to light work with postural limitations.  (R. at 480).

On August 17, 2012, Dr. Pacasio reviewed all the evidence in the Plaintiff's file and affirmed Dr. Franyutti's assessment dated July 5, 2012.  (R. at 494).

On September 19, 2012, Plaintiff followed up with Dr. Osman of Oncology Hematology Associates with no complaints.  (R. at 565).  Plaintiff was to return in three months.  (R. at 566).

On September 21, 2012, Plaintiff met with Dr. Omar as a new patient and Dr. Omar ordered testing and a follow up appointment to discuss results of testing.  (R. at 517).

On September 24, 2012 a chest xray was taken of Plaintiff to determine whether he had hypertension or hyperlipidemia. (R. at 506). No acute pulmonary disease was found and the cardiomediastinal silhouette was normal. (R. at 506).

On September 25, 2012, a CT of the chest, abdomen and pelvis were ordered by Dr. Osman of UHC Oncology. (R. at 508, 575). The CT of the chest showed no evidence for metastatic disease. *(Id.)*. The CT of the abdomen showed multiple gall stones. *(Id.)*. The liver, spleen, right adrenal gland and right kidney appear normal. *(Id.)*. No bowel obstruction. *(Id.)*. The CT of the pelvis showed urinary bladder normal. *(Id.)*. There are surgical changes of the rectum but no definite new findings. *(Id.)*.

On Friday September 28, 2012, Plaintiff was seen by Dr. Omar of Health Access, Inc. as a relatively new patient for his post initial lab and follow up only. (R.at 516).

On October 24, 2012, the UHC Urology daily progress notes indicated urgency and nocturia. (R. at 519). On November 6, 2012, Dr. Fischer saw Plaintiff for follow up of rectal carcinoma. (R. at 592). Dr. Fischer noted Plaintiff "has developed ventral incisional hernias and weaknesses which is not surprising given his obesity." *(Id.)*.

On November 27, 2012, a UHC Urology daily progress note indicated urgency and forceful stream. (R. at 564).

On December 5, 2012, Dr. Fischer performed a colonoscopy plus biopsy of the anastomosis on Plaintiff. (R. at 581, 586). The biopsy was negative for malignancy. (R. at 583, 588).

On December 20, 2012, Plaintiff followed up with Dr. Osman of Oncology Hematology Associates with no complaints. (R. at 567). Plaintiff was to return in 3 months for follow up. (R. at 568).

On January 10, 2013, Plaintiff saw Dr. Fischer regarding his abdominal hernia. (R. at 593).

## D. *Testimonial Evidence*

At the hearing before the ALJ held on February 21, 2013, Plaintiff testified that he was single and had his own home but lived in his mother's home because it was one level and easier for him to get around. (R. at 45.) He takes care of both homes. (R. at 46). Although he has hired people to help him take care of the homes, at times, he can mow for thirty minutes at a time on flat land. (R. at 46-7). He can shop for groceries if the store has a motorized cart. (R. at 47). Plaintiff testified that he drives just about everyday. *(Id.)*.

During the hearing, Plaintiff testified that he last worked as an editor for a newspaper in 1998. (R. at 41). Thereafter he worked as a telemarketer until September 19, 2008. (R. at 42). When asked how his job as a telemarketer ended, the Plaintiff stated as follows:

> The company headquartered in New Jersey went out of business. They slowly went out of business. They—the have branches and have many in West Virginia and they shut down most of the ones in West Virginia, within a month or so, the entire company went bankrupt or they filed for bankruptcy.

(R. at 42). Plaintiff looked for work while receiving unemployment compensation. (R. at 42). The last time Plaintiff looked for work was September 2011. (R. at 43). Plaintiff started receiving Social Security when he turned 62 in May 2012 and therefore has not looked for work since September 2011. (R. at 43).

Plaintiff further testified that prior to his cancer surgery in December 2011, he had been taking care of his mother, who had total dementia. (R. at 43). After that time, she was placed in a personal care home. (R. at 44). Plaintiff's rectal cancer was discovered in September 2011. (R. at 44). He went through 27 days of chemotherapy and radiation; had surgery in December 2011 and

was hospitalized for ten days then went through post chemo therapy. (R. at 44). The whole process was finished by May of 2012. (R. at 44).

E.    ***Vocational Evidence***

A Vocational Analysis dated July 5, 2012, found that Plaintiff could perform work at light exertional level with postural restrictions. (R. at 227). The analysis indicated that Plaintiff could still perform his past work as a telemarketer. *(Id.)*.

Dr. Larry Ostrowski, Vocational Expert (VE), testified at the hearing. (R. at 54-67). First, Dr. Ostrowski summarized Plaintiff's past jobs, as follows:

> ...department editor. That job, according to the DOT, is sedentary and skilled with a SVP of 8. The DOT is 132.037-018.... telemarketer. That job according to the DOT is telephone solicitor, sedentary and semi-skilled with a SVP of 3. The DOT is 299.357-014

(R. at 56). In regard to Plaintiff's ability to return to his prior work, Dr. Ostrowski gave the following responses to the ALJ's hypothetical:

> Q:    Dr. Ostrowski, I'd like you to assume a hypothetical individual with the past jobs you've just described. Further assume this individual is limited to sedentary work, except the work is with occasional posturals, except with no crawling or climbing of ladders, ropes or scaffolds. Also no concentrated exposure to extreme heat, extreme cold, vibration, and hazards such as unprotected heights and moving mechanical parts. Can the hypothetical individual perform any of the past jobs you described as actually performed or generally performed in the national economy?

> A:    Yes, your honor, both jobs.

> Q:    Dr. Ostrowski, for the second hypothetical, I'd like you to consider a hypothetical individual with all of the same limitations as the first hypothetical, but with the additional limitation that the individual is never to stand and walk for more than 15 minutes at a time, and each time of walking is to be followed by sitting for at least 15 minutes. With these additional limitations in hypothetical two, can the hypothetical individual perform any of the past jobs you described as actually performed or generally performed in the national economy?

A: Yes, your honor, both counts with both jobs.

(R. 56-57). When asked how much time is allowed off task at these jobs, Dr. Ostrowski replied that studies show an individual can be off task up to 10 percent of a work period. Additionally, an employer will usually tolerate two unexcused absences per month and allow 15 minute breaks in the morning and afternoon and a 30 to 60 minute lunch period. (R. at 58).

The attorney for Plaintiff questioned the VE about whether in these specific jobs the individual could take those breaks on demand or whether they were usually scheduled breaks. (R. at 59). The VE testified that with both jobs, the individual would be able to take breaks on demand. (R. at 60). There was further discussion about what "on demand" meant. The VE elaborated as follows:

> A: So I was going to say that an individual can--plan on taking a break, and know when they want to do it, but what I said earlier is if a person were in the middle of a phone call and all of a sudden would have to feel the urgency of having to go to the bathroom or something like that, that problem would be disruptive to performing the job. The person could not just stop in the middle of a phone call or it would just, you know, ruin–adversely affect the person's productivity.

(R. at 61). Attorney for Plaintiff then went on to question the VE about the effects of advancement in technology on Plaintiff's past job as an editor. (R. at 64). Dr. Ostrowski answered the inquiry as follows:

> A: I think the base skills that the individual had demonstrated and had developed and learned would still be the same. There may be potential problems with needing to be updated as far a s a particular job, as far as what—technology, the particular newspaper's using, there could be that potential of needing to update the skills.

(R. at 67).

# III.   CONTENTS OF THE PARTIES

Plaintiff, in his brief for judgment on the pleadings, asserts that the Commissioner's decision is not supported by substantial evidence.  (Pl.'s Br. at 8.)  Specifically, Plaintiff alleges that:

- The ALJ committed reversible error by improperly evaluating Billingsley's past experience as an editor as prior relevant work and by failing to consider the vocational expert's testimony regarding available skills relating to this position; and
- The ALJ erred in considering Billingsley's capacity to return to his past relevant work as a telemarketer and should have proceeded to Step Five which would have compelled a finding of disability.

(*Id.* at 8, 12).  Plaintiff asks the Court to reverse the Commissioner's decision.  (*Id.* at 16.)

Defendant, in her motion for summary judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law."  (Def.'s Mot.)  Specifically, Defendant alleges that:

- The ALJ properly evaluated Plaintiff's past experience as an editor as prior relevant work and heard the vocational expert's testimony regarding available skills relating to this position even though he was not required to consider the same; and
- The ALJ properly considered Plaintiff's capacity to return to his past relevant work as a telemarketer.

(Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 13.)

# IV.   STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied.  *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . .");  *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206,

216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

### A. *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-

step sequential evaluation process to determine if a claimant is disabled:

(I) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. *Id.*

**B.** *Discussion of the Administrative Law Judge's Decision*

Utilizing the five-step sequential evaluation process outlined above, the ALJ made the following findings:

1.  **The claimant meets the insured status requirements of the Social Security Act through December 31, 2013. (Exhibit 3D).**

2.  **The claimant has not engaged in substantial gainful activity since September 19, 2008, the alleged onset date (Exhibit 3D )(20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**

3.  The claimant has the following severe impairments: obesity; rectal carcinoma; residual effects, status post, radiation and chemotherapy; history of kidney cancer; edema and central core myopathy (20 CFR 404.1520(c) and 416.920(c)).

4.  Since September 19, 2008, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1525, 404.1526,, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the work; entails no more than occasional performance of postural activities except no crawling or climbing of ladders/roper/scaffolds; entails no concentrated exposure to temperature extremes, vibrations and hazardous such as unprotected heights and moving mechanical parts; and entails no standing/walking for more than 15 minutes at a time with each time walking to be followed by sitting for at least 15 minutes.

6.  The claimant is capable of performing past relevant work as a telemarketer and department editor. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, at any time, as defined in the Social Security Act, from September 19, 2008, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)) on the evidence presented under the law.

(R. at 22-27.)

***C.     There was No Legal Error and Substantial Evidence Supported the Commissioner's Decision that Plaintiff was capable of performing past relevant work as a telemarketer and department editor***

During the fourth step of the sequential analysis for disability, the Administration considers

the claimant's RFC and past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv).

If an ALJ determines that a claimant is able to perform past relevant work, the claimant will not be

found disabled. *Id.* A finding of "not disabled" is warranted if a claimant "is capable of performing his past relevant work either as he performed it in the past or as it is generally required by employers in the national economy." *Pass v. Chater*, 65 F.3d 1200, 1207 (4th Cir. 1995); *see also* SSR 82-61, 1982 WL 31387, at *2 (1982). The Fourth Circuit has held that the Commissioner is entitled to rely on descriptions of job categories contained in the *Dictionary of Occupational Titles* ("*DOT*") as "presumptively applicable to a claimant's prior work." *DeLoatche v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1893). The burden of production and proof is on the claimant through the fourth step of the sequential analysis. *Hunter*, 993 F.2d at 35 (citing *Grant*, 699 F.2d at 191). To meet this burden, the claimant must "show an inability to return to his previous work (*i.e.,* occupation), and not simply to his specific prior job." *DeLoatche*, 715 F.2d at 151 (citing *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981)).

1. **The ALJ properly evaluated Plaintiff's past experience as an editor as prior relevant work.**

    a. **Plaintiff last performed the job in April 1998, fourteen years and eleven months from adjudication.**

As his first assignment of error, Plaintiff argues that the ALJ erred by considering Plaintiff's past experience as an editor as prior relevant work. (Pl.'s Br. at 8). Specifically, Plaintiff asserts that according to the regulations past relevant work is only considered when it is "...done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity [SGA]." (SSR 82-62 referencing Sections 404.1565(a) and 416.965(a)). Plaintiff asserts that his position as editor began in 1972 and terminated in April 1998 and he began work in telemarketing in July 1998. (Pl.'s Br. at 9). From date of adjudication March 5, 2013, it had been 14 years and 11 months since Plaintiff had worked as an Editor. *(Id.).* Plaintiff's argument fails for several

reasons.

First, Plaintiff's past experience does fall within the 15 years specified in the regulation albeit only by one month. Second, Plaintiff worked as an editor for a newspaper for twenty-six years, therefore his job as an editor certainly lasted long enough for him to learn to do it and was substantial gainful employment for him, complying with the other two requirements. Additionally, Plaintiff has a four year college education and there are no allegations that Plaintiff can not mentally perform his past work. All requirements of the regulation were met so the Court finds no legal error in considering Plaintiff's past relevant work as an editor and recommends that the ALJ's decision be affirmed on that claim.

> **b. The ALJ properly did not consider at step four the vocational expert testimony elaborating on Plaintiff's former jobs.**

As a related assignment of error, the Plaintiff asserts that the ALJ erred in failing to consider testimony regarding Plaintiff's current skills relating to the position of editor.

Social Security Regulations provide the following regarding past relevant work: "If you have the residual capacity to do your past relevant work, we will find that you can still do your past work, and we will determine that you are not disabled, *without considering your vocation factors of age, education, and work experience.*" 20 C.F.R.§ 416.960(b) (emphasis added). In the *Pass* case, the court considered whether the nonexistence of Pass's former position as a gate guard has any relevance to the determination at step four whether Pass can perform his past relevant work. *Pass v. Chater*, 65 F.3d 1200, 1207 (4th Cir. 1995); *see also* SSR 82-61, 1982 WL 31387, at *2 (1982). The Fourth Circuit held in *Pass* as follows:

> "Notably absent from both 20 C.F.R. §4165.960(b) and §416.920(e)
> is any mention of the continued existence of past work or the ability
> of the claimant to obtain such work. By referring to the claimant's

ability to perform a "kind" of work §416.920(e) concentrates on the claimant's capacity to perform a type of activity rather than his ability to return to a specific job or to find one exactly like it."

(*Id.* at 1204). In fact the Pass case further states that:

...[I]t is improper to rely upon the testimony of a vocational expert at step four to elaborate on a claimant's former job; the vocational expert's opinion becomes pertinent only after a finding has been made that the claimant cannot perform past relevant work.

(Id. at 1205); *citing Smith v. Bowen*, 837 F.2d 635, 637 (4th Cir. 1987)(per curiam). In this case, the Plaintiff failed to meet his burden to show that he could not perform his past work as editor. There are no allegations of any mental impairment and the Plaintiff has four years of a college education. At step four of the analysis, the ALJ is clearly not required to consider testimony from a vocational expert regarding plaintiff's prior job. Accordingly, the ALJ did not err in failing to consider the vocational expert's testimony regarding available skills relating to the position of editor as it exists today.

In sum, the undersigned finds that the ALJ did comply with 20 C.F.R. 404.1565(a) and 416.965(a) and SSR 82-61 and SSR 82-62 when assessing Plaintiff's capacity to do past relevant work. Substantial evidence supported the ALJ's findings regarding the Plaintiff's ability to perform past relevant work of editor and therefore, it is recommended that the ALJ's decision be affirmed on that claim.

> **2.** **Substantial Evidence Supports the ALJ's residual functional capacity ("RFC") Determination Regarding Plaintiff's Ability to Perform Past Relevant Work as a Telemarketer**.

As his second assignment of error, Plaintiff alleges that the "ALJ failed to determine that Plaintiff's enlarged prostate was a severe impairment and he failed to consider the effects of his central core myopathy and frequency of bowel movements on his capacity to perform sedentary

occupations." (Pl.'s Br , ECF No. 14 at 13). However, Plaintiff's argument is without merit because substantial evidence supports the ALJ's assessment of Plaintiff's RFC.

Under the Social Security Act, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1) (2011). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 21996). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, at *1. Even though the Administration is responsible for assessing RFC, the claimant has the burden of proving her RFC. *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has the burden of production and proof through the fourth step of the sequential analysis); *see also* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." Id. The function-by-function assessment includes an evaluation of physical limitations that may impact the demands of work activity "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other

physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching." 20 C.F.R. § 404.1545(b). Without the initial function-by-function assessment, it may not be possible to determine if the claimant can perform past relevant work at step four of the sequential evaluation process. SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996). The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. *Id.* at *7. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. *Id.*

The ALJ determined as follows with regard to Plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the work; entails no more than occasional performance of postural activities except no crawling or climbing of ladders/roper/scaffolds; entails no concentrated exposure to temperature extremes, vibrations and hazardous such as unprotected heights and moving mechanical parts; and entails no standing/walking for more than 15 minutes at a time with each time walking to be followed by sitting for at least 15 minutes.

(R. at 15). The ALJ specifically looked at the Plaintiff's Adult Function Reports dated November 12, 2011 and June 15, 2012. (R. at 16-17). In reviewing these reports with the medical evidence of record, the ALJ found that the claimant overstated the severity of his conditions. (R. at 17). The ALJ found the two Physical Functional Capacity Assessments of Dr. Franyutti and Dr. Pascaio in July 2012 and August 2012 to be consistent with the medical evidence and the Plaintiff's numerous daily activities. The ALJ further noted that in resolving any and all benefit of doubt in favor of Plaintiff, the ALJ found a more restrictive RFC than proscribed by those doctors to accommodate for Plaintiff's use of an assistive device and his alleged edema. (R. at 22).

Plaintiff asserts that the ALJ failed to determine Plaintiff's enlarged prostrate was a severe impairment and failed to consider the effects of Plaintiff's central core myopathy and frequency of bowel movement on his capacity to perform sedentary occupations. (Pls Br. at 13). However, the undersigned can not find any evidence in the record to support a determination that Plaintiff's prostrate is a severe impairment. On January 31, 2012, Dr. Fischer noted that "I think at some point urology needs to see him because he has only the one kidney and with prostate issues he could end up with a problem." (R. at 415). The ALJ considered Plaintiff's allegations regarding the effects of his central core myopathy and his frequency of bowel movement. However, the ALJ found that "the credibility of such allegations are substantially undermined and not supported by the claimant's reported daily activities and the medical evidence of record." (R. at 16).

This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." *Ryan v. Astrue*, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W.Va. Feb. 8, 2011) (Stamp, J.). If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" *Sencindiver v. Astrue*, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W.Va. February 3, 2010) (Seibert, Mag.) (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

The ALJ specifically refers to the Adult Function Reports filed by the Plaintiff reporting greater functionality than Plaintiff asserted at the hearing. *(Id.)*. Upon review of the record, the undersigned finds that the statement in Plaintiff's Memorandum [14] that Billingsley's testified that numerous disciplinary actions when employed as a telemarketer as a result of his frequent breaks to utilize the restroom are not only inaccurately represented but are inconsistent with the his Adult Function Reports. Plaintiff reports in his ADR dated November 12, 2011, that:

During the telemarketing job we often were required to stand on our feet for about 15 minutes during each 4 hour work shift to "stimulate" harder efforts to obtain telephone pledges. Because of weakness in my legs and feet it was not easy for me to comply to this request. This became an issue at times with certain managers, but my excellent performance and work history at the job usually kept me from being "written up" for discipline. Since I last worked in September of 2008, the myopathy in my legs has gotten much worse. I have an extremely difficult time climbing steps or stairs (even with a handrail) while also having some difficulty stepping over a curb on the street.

(R. at 215). Plaintiff testified at the hearing before the ALJ on February 21, 2013 as follows:

> Examination of Claimant by Claimant's Attorney
> Q:    Robert, you said that you know, you had been laid off from your telemarketing job. Were you having any issues with your telemarketing job prior to being laid off?
> A:    Oh, yes with one kidney, I you know, constantly go to the restroom. Telemarketing is, you know, you're using your mouth all the time, I had water, I drank water a lot, drank a lot of water and of course that filled up my bladders, so--
> Q:    Were you getting written up?
> A:    Yes, I was, because of the time I had to spend off the phone, so I was getting written up. I was penalized for that.
> Q:    And how often were you getting reprimanded at work?
> A:    Probably once or twice a week, sometimes more.

(R. at 51). The undersigned finds there is substantial evidence to support the ALJ's finding that the Plaintiff's health care providers did not consistently note symptoms of significant and frequent urinary and bowel problems and Plaintiff's own reporting of this condition were sporadic and inconsistent at times. (R. at 22). Thus, substantial evidence supported the ALJ's conclusion that these factors did not necessitate additional limitations in the RFC other than what had already be ascribed. *(Id.)*.

In sum, the undersigned finds substantial evidence supports the ALJ's assessment that regarding Plaintiff's RFC that Plaintiff did not meet his burden to demonstrate that he is unable to

perform his past relevant work as it is generally performed.  *See Hunter*, 993 F.2d at 35 (citing *Grant*, 699 F.2d at 191)  Therefore, substantial evidence supports the ALJ's determination that Plaintiff is able to perform his past relevant work as a telemarketer.

## VI.  RECOMMENDATION

For the reasons stated herein, I find that the Commissioner's decision denying the Plaintiff's application for disability insurance benefits and supplemental security income is supported by substantial evidence and there is no legal error. Accordingly, I **RECOMMEND** that the Defendant's Motion for Summary Judgment (ECF No. 19) be **GRANTED**, the Plaintiff's Motion for Summary Judgment (ECF No. 13) be **DENIED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Respectfully submitted this **11th** day of **June, 2014.**

/s/ James E. Seibert

JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE